Our next case for this morning, our third case, is State of Indiana against the Environmental Protection Agency. Whenever you're ready, Mr. Junk. May it please the court. My name is Tim Junk. I'm with the Indiana Attorney General's office, representing the state of Indiana in this petition for a view. Speak up please. No, don't move the microphone. Raise your voice. Okay. We're asking you to review a decision by the EPA and make a narrow holding here that when EPA considers a request to relax the vehicle emission testing required by a state implementation plan under the Clean Air Act and where there are five years worth of... Counsel, before we get into the merits, I have a question about whether we have a justiciable controversy here between Indiana and the EPA. Not simply that the Illinois plan doesn't impose any obligations on Indiana. It's that in its decision on Tuesday, the DC Circuit in the Missouri Commission case held that the reason the two Indiana counties have been included in the Chicago area is because Indiana is polluting Illinois, not because Illinois is polluting Indiana. And if that's what's going on, if the reason for the Zion reading that is the key to all of this is pollution in Indiana rather than pollution in Illinois, I don't see how Indiana has standing to sue Illinois effectively. You're correct in that the DC Circuit did say that Indiana contributes, and our modeling acknowledges that our sources in Indiana contribute to the Zion monitor. And no other monitor has found an excess of ozone anywhere in the Chicago area. So what we're looking at is that the reason the EPA has any authority over this at all is that one reading in Zion, and we have a finding by the EPA, affirmed by the DC Circuit, that the reason for that reading is pollution from Indiana. On page 42 of the DC Circuit opinion, Your Honor, they did say that Indiana contributes too, and that was the standard under non-attainment. Otherwise there would not have been an excess of ozone at all. It would be completely out from under, wouldn't need auto testing of any kind. So we're, Indiana is saying that controls in Illinois are not stringent enough because of a reading in Zion, that under the decision of the DC Circuit is the responsibility of Indiana. That's what seems to be going on here. I don't see why we've got a justiciable controversy. We have a different standard than what was implemented in the DC Circuit, because there it was just whether we contributed to non-attainment, and what was sufficiently big enough to contribute to non-attainment. This case rests on 110L, in which the language is, would interfere with attainment. That's a different standard. In the DC Circuit, we argued that we should have been outside of the normal contribution analysis, because we have the causation analysis, and it all rests, as you correctly point out, on one violation at one monitor, which is undergoing a lot of scrutiny now. One part per billion, right? If you want to keep up with the ones. One-third of one day at one monitor in a three-year period, according to the DC Circuit, caused by pollution from Indiana. Contributed. Well, sent over the line. Maybe we need some separate submissions on the question, whether we have a justiciable controversy here. The parties should certainly do so, if a member of the court would like separate submissions on that point, and rather than try to do it on the fly, I think that's a more efficient way to do it. I will give you, again, 14 days, as I did in the last, to make simultaneous submissions on that point. Thank you, Your Honor. So, I'm curious about the essence of your argument, which is that the EPA is somehow prohibited from retroactively saying that a change a state has made is acceptable, even if it's a change that the EPA is satisfied moves things in the right direction. I think the theme we want to promote here is the one question by Judge Easterbrook in the NRDC case. And in that case, Wisconsin, and this was not a holding, this was a questioning that made its way into the opinion, and that case involved a 2002 changes to the state implementation plan in Wisconsin, and it was 2011 council argument, and the judge asked, how is this actually played out? And Judge Easterbrook commented that, at some point, we need to stop looking at projections and start looking at real facts. And that's what we're saying here. That's where the DC Circuit is going to be a problem for you, but I do think that EPA's position is that it did look at quite a few real facts. It looked at all these factories that had closed down, and I understand the use the same event twice, but you seem to have waived your opportunity to talk about the surplus issue. It wasn't really raised in any way meaningfully. I agree that our comment was pretty brief. We simply commented on there being 11 years worth of offsets. And I don't think that was nearly enough. I mean, if you had been able to put yourself in their position, would you have known that this whole issue was being raised by that remark? I mean, if this were the state of Indiana that you were defending, I assure you, you would be saying no. If some Indiana citizen was suing the Indiana environmental authorities, they would have said, no, you've got to point them in the direction you're trying to go. And you're correct in that that is a stretch to say that we raise the contemporaneous offset as an issue. But we were certainly submitting modeling saying that you should look at contemporaneous as well as surplus. I don't think you hit either one of those. Our comments are briefed or limited to one sentence, Your Honor. I don't believe we hit either one of those other than raising it as an issue to that extent. You know, you're focusing on the data about this, I and what the auto emissions technology was contributing to it. But EPA's response is, you've got to look at everything. You've got to look at mobile sources. You've got to look at stationary sources. We did, in fact, look at the data. In fact, that's why they put the time all the way out to 2012. They didn't, their list of factory shutdowns, right, goes from 2002 to 2012. So it's five years either side of 2007, which is when the IM change takes place. And they are, in fact, exactly looking at the data that has been accumulated since the law changed. But as you referenced earlier, Your Honor, that it's not quite the same thing when you offset one emission from another at an above or a high level or an elevation against something that's a tailpipe. It's not as tricky, but on the other hand, what we're trying to do is clean up the air. And one part of this approach is to understand that there are lots of ways to get at it. That's why these offsets are even permitted. We're not going to just insist on everybody marching in lockstep. If a state can achieve tremendous reductions in ozone or any other, you know, particulate pollutions, whatever, through a offset. And offsets are appropriate and there's plenty of case law that defers to offsets. It makes sense, doesn't it? Absolutely, Your Honor. And in footnote six on page nine of the UK's brief, they list seven different instances where SIP approval has been approved per the guidance. Some of those were offsets, some of those were attainment demonstrations. So they can trade off. So your position that they can't trade off is just not right. No, I would say that when you can use an post-change data already available, that calls into question whether offsets are accurate. And that's where we're deviating from the guidance and from the prior case law. We're saying that this change was implemented. It's been implemented for over six years. We now have a Zion monitor and post implementation data. And to come to EPA now and say, well, would you approve what we did, what we started doing in 2007? We want more than an offset. We think you need to look at an air quality determination. So what's the data that says this one eight-hour period in Zion is because Illinois decided to start using these onboard computers for measuring automobile emissions? And by the way, I'll add further the point, Indiana seems to take the position that this is a static situation, but it seems to me as a matter of common sense that every year that we see cars on the road from 1968 to 1995 models. You're absolutely right, Your Honor. And so the Illinois system is cleansing itself out of this old group of cars anyhow. As time goes on, the effects become less and less, but we are looking at... But you didn't argue that. You said they were going to be the same. Well, we are locked in purpose, for purposes of commenting on a proposed change and for this court's review. We're locked in a period of time and a record. And for every year beyond, we're going to see less and less older cars on the road. Yeah. But that, our analysis as presented to EPA and as reviewed by this court, is limited to the time period that we've, that we're pertaining to. I mean, maybe this is getting too technical. EPA was not persuaded by the modeling that you did that this one part per billion in Zion could be traced to the IM technology that Illinois has been using since 2007. How do you do that, as opposed to, for example, what the DC Circuit is saying, think that it's because of something else? Well, Your Honor, all focus is on the Zion monitor and the violation. Our modeling started there, saying we have 76 at the conclusion. Now EPA's comment didn't address that. But did you ask for other, did you control for changes in other potential contributors to the pollution? I don't believe they did, but Your Honor. That would seem really important to me. What if somebody opened some dirty new plant near Zion and they somehow avoided all sorts of regulation? Well, we were looking at the contribution from vehicles that were no focused in on that. And as all modeling does, we have to make assumptions to get there. But you have to assume that factory emissions are the same, that winds, you know, things from Indiana are the same. You have to somehow isolate the contribution of the IM technology. Yes, and this is precisely the problem with the offset analysis that EPA did. It's a crude analysis. It says, well, the factory's the same as the tailpipe, and so forth. But they're measuring ozone. They at least are asking, how much ozone is there? And are we achieving what we need to? And there's a great reduction from the factories, maybe an uptick on the IM side. And I just, I'm concerned they criticized your methodology, and I'm just trying to understand it a little bit myself. And I would look at page 8 of our brief where we quote the short appendix and the one or two sentences that EPA gave us in response, where they said if we had modeled the decreases from IM, from the vehicle inspection and maintenance changes, and factored in, modeled the increases and factored in the decreases, we would have modeled a lower downwind ozone emission. But that's, they're really saying prospective modeling. We started at the 76 and tried to parse out what made that 76. And if we lower the amount coming from stationary sources, that just means something else had to cause that 76, because the endpoint is known. And yet EPA's comment seems to say if we factored in differently, we'd have gotten to a different endpoint at the Zion monitor. We started there. We want to model back. It's really talking past each other. They didn't give us a reasonable explanation, Your Honor. If this was a case where we were saying our modeling is better than your modeling, the New York case says we lose. It's not that case. We're giving them modeling, and they're not giving us a reasonable explanation. Even under scientific deference, the highest deference that there is, there has to be a reasonable explanation. And we didn't get a reasonable explanation as to why our modeling was inadequate to show that the changes to the vehicle emission testing program in Illinois caused or interfered with attainment at the Zion monitor. In fact, the evidence that we submitted shows just the opposite. Okay. Well, if you'd like to save a little rebuttal time. Yes, Your Honor. Let me do that. Mr. Jacoby? Good morning. May it please the Court, my name is Patrick Jacoby. I represent the United States Environmental Protection Agency and Administrator McCarthy. Seated with me at Council Table is Chris Leshefsky from the Region 5 office here in Chicago. Your Honors, this petition boils down to Indiana's refusal to acknowledge sound science. It's reflected in two specific points. First, EPA reasonably approved Illinois' demonstration that the Illinois state implementation plan. Does the Illinois plan predict a decreasing effect of the older cars that are not being tested under this 2006 system exemption? Your Honor, I think the answer is yes. I want to make sure I understand the question. Does it predict that the cars not included in the inspection program are decreasing? Right. Yes, that's the idea, is that as the fleet modernizes, as it's stated in the Illinois submission, and the older cars are phased out and go into retirement or are turned into scrap, those cars no longer are on the road, they're no longer emitting emissions, and since everything is now digitalized, so to speak, in the OBD process, it's just much more efficient to head that way. And in fact, most states are heading that way, and that's part of the reason for the change. The second point I wanted to make, aside from the offsets, is that EPA reasonably rejected on a scientific basis Indiana's comments to the proposed approval. And specifically, since you've asked Mr. Junk about it, I'll turn to specifically, he says that they didn't get a reasonable explanation for why their modeling doesn't suffice. Well, Judge Wood has pointed out the notion that their modeling doesn't reflect any of the facility shutdowns, so that's one point that EPA made in its approval. The second point that EPA made is not quite as explicit as the D.C. Circuit said it, but it's the same point. And so I'll point you to three places in the record that all make the same point, and I'll lay them out, and then I'll kind of compare them for you. First is in, it's page three of Petitioner's Short Appendix. There's a statement that says, in criticism of the modeling, that the modeling doesn't address the fact that the amount of emissions from the inspection and maintenance change are decreasing. So the most emissions from the change happened in 2007, then the next year it's 2000, or then it's a little bit less in 2008, a little bit less in 2009, and so forth. There's a little bit of an increase in 2012, but for the most part, the amount of emissions increases are headed down. So that's one idea, and that's the statement that was made there. And this is sort of explained on page 41, 42 of our brief. Then, as we noted on page 42, footnote 29 of our brief, the model, and Mr. Junk may have explained why the model does this, the model makes an assumption after the year 2007 of a 35% increase of emissions from the Illinois inspection and maintenance change. And so instead of noting that the emissions are coming down after 2007, Indiana's model does the opposite. So you sort of have vectors going in two different directions here. As EPA has demonstrated via the MOVES 2010A modeling that Illinois did, it's coming down, Indiana's saying what's going up, it's going up, on this huge basis that if you look at the record itself, at the petitioner's appendix at page 169, it actually says the 35% does not represent reality. And so that's a key point that's reflected in the note in the approval by EPA. Now if you turn to page 42, footnote 12 of the D.C. It says, the second part of the analysis, and I'm going to quote here, rested on a factual premise that the state never adequately explained, that the statutory change caused the emission reduction benefits of Illinois' vehicle emissions testing program to decrease by 35%. So the D.C. Circuit has made the exact same finding, maybe in different words, but it's the same idea as EPA made here, and the D.C. Circuit has rejected Indiana's technical analysis on one of the same bases. Obviously there's another basis in here and we've offered others. So Mr. Junk's point that they didn't get a reasoned explanation, well, I think they got it from us, and now they've definitely got it from the D.C. Circuit on the same basis. And what I might offer is that's exactly what's wrong with Indiana's technical analysis. As Mr. Junk noted, it works backwards. So they had to make the numbers come up to show a one part per billion increase. They picked a number out of the air, which is 35%, and that's how they made the math work. And that is why EPA rejected the model, among others. So why did, during the period between 2006, 2007, and 2012, I mean, EPA wasn't concerned at all that Illinois had made perhaps a significant change to the way its vehicle emissions were being monitored, even though EPA, Illinois was in a state of noncompliance at that point. I don't think it was severe anymore, but it was still in a noncompliant position. Your Honor is correct in alluding to some of the reasons why EPA did not seek to enforce against Illinois, other than its sort of prosecutorial discretion, limited government resources. If you put the inspection and maintenance change in context, what you have is an area in 2007 where it looks like Chicago is getting close to achieving attainment for the 1997 standard. In terms of the 2008 standard, which hadn't come out yet, there's nothing to decide yet. So Illinois makes this change, and it's a legislative change that the Illinois administrative bodies have to react to and try to put in place by a date certain under the law. So then in 2008, when EPA sets the level for the revised ozone standard, we now know that from 2008 until 2011, there was no exceedance of the 2008 standard. So EPA is looking at Illinois. They understand they've made this change. They are aware that Illinois is trying to figure out how to do a SIP revision, and there is no problem at that point. There's no ozone exceedance or violation anywhere in the area, and it looks like Chicago is on its way to meeting attainment, and that's why they didn't address it before. So could you explain to me what the burden is on a political entity, whether it's these Indiana counties or the Chicago area, moving from the attainment status to the marginal non-attainment status? You have to do more things each time you get worse, right? You've got to comply with more? Your Honor is correct that as the severity of the designation increases, there are more requirements. What I would point out in this case, and it's part of why EPA made its determination that the change would not interfere with attainment, is at the time of the submission to EPA, which is what's that issue in this case? The 2012 submission. Yes, November 2012, and at the time of the proposed approval in August 2013, especially the Chicago area was in what's called marginal non-attainment. That is the lowest level. It's sort of just one above actual attainment, and there was a proposed rule out at the time this submission was made to EPA that said all that will be required of marginal non-attainment areas is to submit an admissions inventory. It won't be required to do an attainment demonstration, a further request for further reasonable progress, all these other things that go along with these more severe designations. In fact, the proposed implementation rule for the marginal non-attainment areas says we think you're just going to sort of graduate in an attainment without anything else happening. No localized changes are required. It's just sort of assumed that the marginal will become attainment by the date set. In fact, in the final version of the implementation rule, it says, again, all that's required is the admissions inventory. That's part of why the single ozone detection, this one detection, really is not germane to this determination. What I would add further, as we've discussed causation a little bit here, is that if you think about when this detection occurred, it occurred in 2011. Again, going back to the levels for the changes in the vehicle inspection change, the spike, the most emissions from that change happened in 2007. So if there was going to be an exceedance based on that or caused by that, we would have expected to see it in 2007, 2008, 2009. At the outside edge, 2010. It didn't happen until 2011. And so that plus all these offsetting facility shutdowns show to EPA that there's no causal link here. And that's exactly what it says in their approval. When you look at all this in context, the causal link falls apart. I want to get back to sort of one of my main points. It was basically conceded by Mr. Junk that the offset policy is valid. What he says here is that it shouldn't happen this way. And the only point they've really made to try to cast any aspersions or doubts on the use of the offset policy here is this idea of different elevations for the two types of emissions, automobiles versus stationary sources. They really mean literally elevations too, right? Ground level versus up in the air somewhere. That's my understanding. I don't think the court needs to worry about that at all here for a couple of reasons. One, they did not make that argument during the comment period, and it is waived. Second, to the extent they raised it in the briefing, their initial brief has one sentence that maybe alludes to that, which is certainly not enough to really hold it through the briefing. And beyond that, it's sheer speculation. There's no data. They're not pointing to any guidance. They're not pointing to anything to say that EPA treats these differently in this section, other than the noninterference guidance, which uses that as one of four factors, to say that if those factors are met, EPA could, in its discretion, choose to require further demonstration and modeling. And so Mr. Junk has conceded that the offset policy is valid, and his only real complaint against what EPA did here in terms of the offsets is, frankly, waived and littered with speculation that EPA need not address, and in its discretion did not see as a problem at all here. I would also note, since we've talked a little bit about the offsets here, Judge Wood, you had a discussion about this five-year period. I would just note. Right. Well, actually about the fact that you were looking at shutdowns for a 10-year period, but 02 to 12. Correct. And so I would just note, so it's a little bit hard to understand. It was hard for me to understand at first, but it works this way. The reductions are actually contemporaneous year by year. And I don't know. We tried to make that as clear as we could in our brief, and we've tried to make that as clear as we could in the proposal and the final rule, but that's why the year-by-year comparisons are there. And the basis for that is, let's say a facility shuts down in 2005 and 10 tons per year come out of the air because of the loss of that permitted emission. Well, those same 10 tons per year also come out of the air in 2006 and 2007. But do you go forever that way? I mean, it seems absurd to me, actually, to think when we get up to 2050, you're still going to be counting these 10 tons a year. Well, these will only count for this specific offset. They'll never be counted again. In this case, they would be counted out to 2025, some of them happening later, some of them happening earlier. So there's an outer limit for how long? There's an outer limit within this rule. The useful life of the plant? What's the outer limit? Operations are assumed to go forward for the purposes of this approval. First, I would say Chicago only needed to show that the shutdowns from 2005 and 2006, they could have just used those because those by themselves offset all the emissions from the inspections and maintenance program because they occur, again, each year. So they are contemporaneous year by year. It does go out to 2025, but so do the increases in emissions here. And so that's how EPA set the timeframe for this. They felt that was reasonable. And then what I would also offer is that the way that it's limited is that these, now that these facility shutdowns have been used as reductions, they can never be used again in any part of the set. And that's the limitation. If I may also, I just want to make one more point on the offset issue, and that is that Indiana has tried to call it simple math. Your Honor, it's not simple math, although the math does certainly work. The science behind the sort of pluses, the emissions increase, is based on the MOVES 2010A modeling that Illinois did. And the minuses, the facility shutdowns, are based on judgments made by the state about how much each permit, how much each facility should be permitted in terms of its emissions. And so there's science on both ends of the pluses and minuses here, and that's why we think it's a sound basis in science. Your Honor, at this point, I'm going to go ahead and conclude. For all the reasons we've discussed, we think that Indiana has not shown that the court should deviate from the deference owed to EPA and should deny the petition. And before I sit down, the submissions you wanted in 14 days, is that simultaneous? Simultaneous submissions. And you would like them from both parties? Yes, please. Okay, thank you. And, you know, I would expect that you would discuss whatever impact you think the D.C. Circuit's decision has on the case before us. Thank you. Mr. Junk. Mr. Junk. I think the court would want to hear where this 35% number came from. On page 168 of our appellate record, Indiana, in a paragraph, Indiana describes how we did modeling and we're considering the exact change that was made in Illinois. And we did the modeling and came out with numbers for what the impact would be based upon the modeling. Now the modeling was very conservative. So then we compared it to tailpipe emissions that were actually measured for cars that failed. And what we found is that the actual emissions would actually be twice what the model predicted. So that's why when we did the modeling at the Zion Monitor and found out that it was 0.2 parts per billion, we would double that because that's what our evidence from our experience in Indiana says when the real world data says compared to modeling predictions. We look at an increase. The 35% was an arbitrary number picked by the state, but it was less than the 50% that was projected. So we simply took 35% because there would be differences in fleets and other factors. It was a conservative number based upon our real world experience in Indiana when we considered it. And we wanted to know real world experience because we could relax our vehicle emission testing and have modeled effects. But down the road when the real effects take place, we've got to do something about that. And you asked about the burden on Indiana for being a nonattainment. Marginal nonattainment. Marginal nonattainment. Oh, I'm sorry. You can answer that very quickly and then unless one of my colleagues has a question. It goes beyond vehicles. It affects our industry because they now have additional permitting requirements that are a disincentive to locating or expanding industry in Indiana. All right. Thank you very much. Thanks to all the council. We'll take the case under advisement. Thank you.